UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATRINA SINGER, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 12 C 9138 |
| EINTELLIGENCE, INC. and METABANK, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**CHARLES P. KOCORAS, District Judge:**

This matter comes before the Court on the motions for judgment on the pleadings of Defendants EIntelligence, Inc. ("EIntelligence") and MetaBank (collectively "Defendants") pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)") and the motions for summary judgment of Defendants under Federal Rule of Civil Procedure 56 ("Rule 56"). For the following reasons, the Court denies Defendants' motions for judgment on the pleadings and grants summary judgment in favor of Defendants. The pending motion to certify the class is denied as moot.

BACKGROUND

**I. Facts**

The following facts are taken from the parties' respective statements and exhibits filed pursuant to Northern District of Illinois Local Rule 56.1. The Court

1

reviews each Local Rule 56.1 statement and disregards any argument, conclusion, or assertion unsupported by the evidence in the record.  The parties do not dispute the facts below unless otherwise noted.

This case arises out of an alleged violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § § 1693 *et seq*. and its implementing regulations, 12 C.F.R. § 205 *et seq*.  EIntelligence is an Independent Sales Organization ("ISO") with its headquarters in Illinois.  MetaBank is a chartered savings bank with its principal place of business at 121 East Fifth Street in Storm Lake, Iowa.

In early 2012, EIntelligence began discussions with 7700 Kedzie Gas Corporation ("Kedzie Gas") to sell Kedzie Gas an automated teller machine ("ATM").  On February 8, 2012, EIntelligence and Kedzie Gas entered into a Merchant Processing Services Agreement ("Processing Agreement") that included a provision stating that EIntelligence has "the exclusive right to manage the [ATM]. . . subject to [Kedzie Gas's] responsibilities for [the ATM]. . ."

In accordance with the terms of the Processing Agreement, EIntelligence became the ISO and also contracted to service the ATM.  As the servicer, EIntelligence would respond to calls or requests by Kedzie Gas and provide the necessary maintenance to the ATM machine through the hiring of independent contractors.  It was Kedzie Gas's responsibility to call EIntelligence with any

maintenance issues, such as the ATM in need of money, paper or service. The parties dispute whether EIntelligence was responsible for the fee notice stickers.

Kedzie Gas was the sole entity responsible for determining the amount of the surcharge fee that was charged to users of the ATM. The surcharge fees for the ATM were routed through the processor and credited to an EIntelligence bank account number. Once a month, EIntelligence would pay Kedzie Gas the total surcharges for that particular month, after deducting its maintenance fee and any applicable fees charged by the various industry service providers and processors. Kedzie Gas paid EIntelligence a maintenance fee of either $0.25 per transaction made at the ATM in question or $100.00 per month, whichever was the lower charge for the servicing of the ATM. EIntelligence also paid MetaBank a monthly fee for its services as sponsoring bank.

In 2008, EIntelligence entered into a Retail Services and EFT Processing Agreement with First Data Retail Services, L.P. ("FDRS"), a processor. However, a processor must have a sponsoring bank to process the ATM transactions through various networks (Visa, MasterCard, etc.). Networks require sponsoring banks to ensure proper registration of each ISO. On February 8, 2012, MetaBank, a member of the networks, entered into a Merchant Participation Agreement with Kedzie Gas to be the sponsor bank for the ATM that Kedzie Gas would soon purchase from EIntelligence.

Pursuant to the contract between Defendants, MetaBank had the ability to conduct an audit or review of EIntelligence's operations, book, and records to determine compliance with its contract, policies, procedures, and rules of the networks. However, under the contract, MetaBank required notice of any new law related to the ATM. EIntelligence was the entity responsible for complying with all applicable laws.

On February 20, 2012, EIntelligence sold an ATM to Kedzie Gas and enrolled it into EIntelligence's ATM program, which then connected the ATM with the designated processor, FDRS. FDRS then connected the ATM to networks, which provided the connection between the ATM and a customer's bank account. On March 3, 2012, the ATM was installed at Kedzie Gas with a posted fee notice sticker affixed to the front. The fee notice sticker stated: "This terminal is Operated by MetaBank and is Serviced by eIntelligence ATM in compliance with all regulatory and network rules. MetaBank may charge a $2.50 fee to cardholders for each case withdrawal."

On October 15, 2012, Singer used the ATM located at Kedzie Gas to withdraw money from her bank account. There was a screen notice that a fee would be charged for a withdrawal from the ATM, but Singer alleges that there was no fee notice sticker posted at a prominent location on or near the ATM. Singer's receipt from the transaction stated that the surcharge was paid to EIntelligence ATM. Defendants

provide time-stamped photographs from March 3, 2012, June 18, 2012 and September 24, 2012, all of which show a fee notice sticker on the ATM at Kedzie Gas. Singer argues that these photographs are inadmissible as evidence.

With respect to EFTA compliance, EIntelligence had a two-page policy ("EFTA policy") which discusses "Signage Compliance." According to the EFTA policy, EIntelligence had a system in place to monitor and replace defaced or removed ATM fee disclosure notices. An EIntelligence representative, key custodian or servicing agent would take: (i) a time-stamped photograph of each ATM when a fee sticker had been affixed; (ii) a time-stamped photograph of the exterior of the location where the ATM was located; and (iii) a time-stamped photograph if a fee sticker had been reapplied or replaced. Also, whenever an ATM was visited by an EIntelligence representative, the ATM would be visually inspected to ensure the required fee sticker remained displayed, and a photograph was sometimes required to be taken. If an ATM sticker was removed, EIntelligence may require the representative to take a time-stamped photograph of where the sticky residue remained or any other incriminating evidence that the fee sticker had been tampered with.

Between September 26, 2012 and October 24, 2012, Singer made two ATM withdrawals from Kedzie Gas and another gas station in Markham, Illinois operated by Illinois State Petroleum Corporation. She subsequently filed the instant lawsuit against Kedzie Gas and a nearly identical lawsuit in this district against Illinois State

5

Petroleum Corporation. On October 16, 2013, Singer voluntarily dismissed her case against Illinois State Petroleum Corporation.

**II. Procedural History**

On November 14, 2012, Singer filed her second amended class action complaint against Defendants on behalf of herself and all other similarly situated persons who were charged an ATM transaction fee at Kedzie Gas during a specified period of time. Singer alleges that when she used the ATM there was only an on-screen notification of the $2.50 fee and no fee notice posted on or near the ATM, in violation of the EFTA, 15 U.S.C. § 1693b(d)(3) and Regulation E, 12 C.F.R. § 205.16(c). On March 31, 2014, MetaBank moved for judgment on the pleadings. On April 2, 2014, MetaBank moved for summary judgment. On April 3, 2014, this Court granted EIntelligence's oral motion to join MetaBank's motion for judgment on the pleadings. On April 17, 2014, EIntelligence filed a separate motion for summary judgment.

**LEGAL STANDARDS**

A party may request judgment on the pleadings once the pleading period has closed. Fed. R. Civ. P. 12(c). When considering a motion for judgment on the pleadings, the court regards all well-pleaded facts as true, views them in the light most favorable to the plaintiff, and draws all reasonable inferences in favor of the plaintiff. *Hentosh v. Herman M. Finch Univ. Of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999). A court should grant a Rule 12(c) motion only when it

appears beyond doubt that the plaintiff cannot prove any facts to support a claim for relief. *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000) (citing *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989)). The complaint need only "narrate a claim," and need not depend on a particular theory of recovery. *Id.* at 368. "A plaintiff may supplement the complaint with factual narration in an affidavit or brief. If the extra assertions make out a claim, then the complaint stands." *Albiero v. City of Kankakee*, 122 F.2d 417, 419 (7th Cir.1997).

Summary judgment is appropriate when the pleadings, discovery, disclosures, and affidavits establish that there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial. *Id.* at 325. The non-movant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with documentary evidence. *Id.* A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court construes all facts and draws all reasonable inferences in favor of the non-movant. *Id.* at 255.

## DISCUSSION

### I. Congressional Amendment to the EFTA

When the events giving rise to this lawsuit occurred, EFTA's notice provision required both an on-screen fee notice and a fee notice posted on or near the ATM. 15 U.S.C. § 1693b(d)(3)(A)-(B), *amended by* Act of Dec. 20, 2012, Pub.L. No. 112-216, sec. 1, 126 Stat. 1590. On December 20, 2012, the notice requirements were amended in a bill called H.R. 4367 (the "amendment") that was unanimously passed by both Congress and the Senate and signed by the President. *See* Act of Dec. 20, 2012, Pub.L. No. 112-216, 126 Stat. 1590 (removing the "on machine" notice requirement). The amendment changed the EFTA, and revised the notice provision to state:

> "The notice required . . . shall appear on the screen of the automated teller machine, *or* on a paper notice issued from such machine, after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction."

15 U.S.C. § 1693b(d)(3)(B) (emphasis added). Congress did not unambiguously state that the amendment was to apply retroactively. Defendants urge this Court to apply the amendment to the instant case. Singer argues that the amendment is not retroactive and claims that when no language in the statute exists concerning retroactivity that there is strong presumption against it.

Although the Seventh Circuit has not expressly touched on the issue of whether the amendment is retroactive, in *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672 (7th Cir. 2013), a recent case involving class certification in a similar EFTA case, the

8

Seventh Circuit specifically acknowledged that the amendment removed the requirement of the sticker notice. Additionally, there are a handful of EFTA cases from various district courts in other circuits that have addressed the question of retroactivity. Each case thoroughly discusses their take on the lack of congressional direction, but in its current state, it appears that most courts have found that the amendment is not retroactive. A review of the case law supports this contention. *See Pike v. Nick's English Hut, Inc.*, 937 F. Supp. 2d 956 (S.D. Ind. 2013) (where the court noted that there is precedent declining to apply the new provision retroactively); *Gawarecki v. ATM Network, Inc.*, 11-cv-1923 SRN/JJG, 2014 WL 2600056 (D. Minn. June 10, 2014) (where the court held that the EFTA does not evince any clear expression of congressional intent that the new notice provision applies to cases arising before its enactment); *Brown v. Wells Fargo & Co.*, 2013 WL 6851068 (D. Minn. 2013) (citing *Charvat v. Mut. First Fed. Credit Union*, 725 F.3d 819, 824 (8th Cir. 2013), *cert. denied*, S. Ct. 2014 WL 901856, 82 USLW 3367 (2014) (where the plaintiff had a vested right to "a particular form of notice" before an ATM transaction fee could be levied). *But see Mabary v. Hometown Bank, N.A.*, Civ. No. 4:10-3936, 2013 WL 1124026 (S.D. Tex. Mar. 18, 2013) (where the court found no vested right and refused to apply the presumption against statutory retroactivity).

Following the precedent established by a majority of the cases that have recently broached whether H.R. 4367 is retroactive since its December 20, 2012 enactment, this Court agrees that Singer currently has a vested right in this case

9

considering the fact that "[t]he law disfavors a retroactive application of a statute," especially when congressional intent remained silent as to its retroactivity. *See Stone v. Hamilton*, 308 F.3d 751, 754 (7th Cir. 2002) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). The Court holds that the pre-amendment version of the EFTA notice requirement applies and Defendants' motions for judgment on the pleadings must therefore be denied.

## II. Motions for Summary Judgment

### A. ATM Operators

Both Defendants filed motions for summary judgment arguing that under either version of the EFTA they are not "automated teller machine operator[s]" as prescribed in 15 U.S.C. § 1693b(d)(3)(D)(i) and 12 C.F.R. 205.16(a) and thus, cannot be found liable for a violation of the EFTA. Defendants assert that Kedzie Gas, a non-party, is the actual operator of the ATM.

Defendants can be found liable for a violation of the EFTA if the facts establish that either MetaBank or EIntelligence was: (i) an operator of the ATM at issue; and (ii) imposed on consumers a fee for initiating electronic fund transfers and/or balance inquiries at the ATM at issue. 15 U.S.C. § 1693b(d)(3)(A). The EFTA defines an "automated teller machine operator" as "any person who (i) operates an automated teller machine at which consumers initiate electronic fund transfers; and (ii) is not the financial institution that holds the account of such consumer from which the transfer is made." 15 U.S.C. § 1693b(d)(3)(D)(i). A "person" is defined as "a natural person

10

or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association." 12 C.F.R. § 205.2(j).

At the time Singer withdrew money from the ATM at Kedzie Gas, the EFTA required an ATM operator to provide notice to the user of fees charged for use of the machine "in a prominent and conspicuous location on or at the [ATM]", and "on the screen of the [ATM], or on a paper notice issued from such machine, after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction. . . ." 15 U.S.C. § 1693b(d)(3)(B); 12 C.F.R. § 205.16(c)(1). The ATM operator could not impose a fee unless the consumer received the above notice and "elects to continue in the manner necessary to effect the transaction after receiving such notice." 15 U.S.C. § 1693b(d)(3)(C); 12 C.F.R. § 205.16(e).

### 1. Whether MetaBank is an Operator

MetaBank contends that it escapes liability under the EFTA because it is not an operator and did not impose the surcharge. First, MetaBank claims it is not an operator because the term "automated teller machine operator" is not clearly defined (an operator is any person who operates an ATM). MetaBank asks this Court to use the ordinary and natural meaning of "operator," which denotes "control over the function" of an ATM or, as understood in an organizational sense, "conducting the affairs of" or actively managing the ATM. *See United States v. Bestfoods*, 524 U.S.

51, 66 (1998) (where the court used dictionary definitions to determine an "operator" which was not defined in the CERCLA statute).

As support, Singer points to the photograph of the fee sticker in the record, which states: "This terminal is Operated by MetaBank and is Serviced by eIntelligence ATM in compliance with all regulatory and network rules. MetaBank may charge a $2.50 fee to cardholders for each case withdrawal." On the sticker's face, it looks as though MetaBank is the operator of the ATM and determines the surcharge fee. However, MetaBank argues that it was referred to as an "operator" on the notice sticker only because it was required to comply with the operation regulation of the networks and to use the verbiage that the networks required at the time.

Second, MetaBank states that there is no evidence, much less a genuine issue of fact, that MetaBank had an obligation to disclose fees charged to ATM users because it never imposed fees in the onset. Singer disputes this, claiming that MetaBank "was an integral part of the force that imposed surcharge fees on the consumer" and "directly received money from the amalgamated set of funds that included consumer surcharges from the ATM at Issue."

After careful consideration, this Court finds there is no genuine issue of material fact as to whether MetaBank was an operator of the ATM at Kedzie Gas. Looking beyond the fact that the ATM fee notice sticker states MetaBank "operate[s]" the ATM, this Court has come to its conclusion that MetaBank is not an operator by

examining how the EFTA defines "automated teller operator", how dictionaries define operator, and similar EFTA cases that have interpreted which entities are considered operators.

MetaBank does not own the ATM at Kedzie Gas. *See Stilz v. Meta Financial Group Inc.*, No. 11-cv-05631 (N.D. Ill. April 18, 2012) (where the court found that Meta Financial Group, also known as MetaBank, was not an operator and granted an uncontested motion for summary judgment in favor of MetaBank); *see also Chayra v. Family Dollar, Inc.*, No. 11-01710, 2012 WL 5304735 (D. Nev. 2012) (where the court looked to the plain meaning of "operator" and determined that the logical operator of the ATM at issue was its owner, whom engaged in the ATM transactions, not the store where the ATM was located). MetaBank does not actively maintain or manage the ATM at Kedzie Gas—it was not involved with any of the processing of the ATM transactions and did not handle the surcharges. MetaBank's main role was to act as EIntelligence's sponsor bank and allow access to certain networks like Visa and MasterCard.

Although there is a chance that EIntelligence may have paid MetaBank a monthly fee for its services as the sponsor bank of the ATM with profits made from the surcharges, there is no evidence in the record that MetaBank was the entity behind imposing the surcharge fees on consumers. Moreover, in the contract between Defendants, MetaBank relinquished control over the function of the ATM to

EIntelligence. MetaBank had policies in place to ensure compliance with the EFTA, and required EIntelligence to notify it of any new law affecting the ATM. However, MetaBank specifically designated compliance with the EFTA to be the responsibility of EIntelligence. All of these facts persuade the Court that MetaBank was not an automated teller machine operator under the terms of the EFTA.

### 2. Whether EIntelligence is an Operator

EIntelligence claims it is not an operator of the ATM. Instead, EIntelligence points to Kedzie Gas, the true owner of the ATM, as the operator. EIntelligence also argues that it did not impose a surcharge fee on consumers using the ATM because Kedzie Gas determined the amount of the fee and the money that Kedzie Gas paid EIntelligence for its services remained constant, whether or not the surcharge fee amount changed. Singer disagrees, claiming EIntelligence is an operator of the ATM at Kedzie Gas and exerted control over the transactions.

This Court finds that there is a genuine issue of material fact as to whether EIntelligence is an operator of the ATM at Kedzie Gas. The evidence in this case indicates that EIntelligence exhibited a level of control and management over the ATM consistent with the ordinary and natural meaning of the word "operator." Even though Kedzie Gas technically owned the ATM, EIntelligence remained associated with the ATM by providing general maintenance and actively managing its processing services. This is illustrated in the Processing Agreement between EIntelligence and Kedzie Gas which states that EIntelligence has "the exclusive right to manage the

[ATM]. . . subject to [Kedzie Gas's] responsibilities for [the ATM]. . ." Nowhere in the EFTA or in relevant case law does someone or something have to physically possess the keys, passwords, or load the cash in order to be considered an operator.

Furthermore, the facts show that a reasonable jury could conclude that EIntelligence imposed, or enforced, the surcharge fees through its inner dealings with Kedzie Gas. As the servicer of the ATM, EIntelligence imposed surcharges in the sense that the money was immediately collected by and routed through FDRS and directly deposited in EIntelligence's bank account after a consumer engaged in a transaction. The receipt Singer kept after she used the ATM at Kedzie Gas also stated that the surcharge was paid to EIntelligence. After deducting its maintenance fees and any other applicable fees each month, EIntelligence would issue a check of the remaining surcharge fees directly to Kedzie Gas. Just because Kedzie Gas controlled the amount of money charged to a consumer using the ATM does not safeguard EIntelligence from liability for acting as an operator of the ATM at Kedzie Gas and imposing a surcharge fee on consumers. At a minimum, these facts present a genuine dispute as to whether EIntelligence is an operator under the EFTA. Nevertheless, the EFTA does provide affirmative defenses to protect an operator that violates its provisions.

**B. Bona Fide Error Defense**

EIntelligence moves for summary judgment, arguing that the bona fide error provision under 15 U.S.C. § 1693m(c) protects it from liability. EIntelligence asserted both the bona fide error and safe harbor affirmative defenses in its answer to the second amended complaint, but fails to expound on the safe harbor defense under 15 U.S.C. § 1693h(d) in its motion for summary judgment (even though it labels a heading in its reply brief "EFTA's 1693m(c) Safe Harbor Provision is Applicable"). This Court will only assess the bona fide error defense.

The bona fide error defense provides that "a person may not be held liable. . . if the person shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1693m(c). Under this provision, a defendant is not liable for a missing ATM fee notice if: (i) the defendant maintained "procedures reasonably adapted to avoid" a missing notice; and (ii) the lack of a notice was "not intentional," but was a "bona fide error." *Id*.

EIntelligence supports its affirmative defense with several affidavits and photographs. Singer claims that the evidence provided is insufficient to establish that EIntelligence's policies and procedures satisfy the bona fide error defense. Singer argues that the two-page policy on EFTA compliance was not reasonably adapted by EIntelligence to avoid error. Also, as support, Singer cites to the fact that none of

16

EIntelligence's actual employees visited Kedzie Gas to follow these policies and procedures, only independent contractors hired by EIntelligence.

EIntelligence serviced Kedzie Gas for approximately eight months before Singer withdrew money from the ATM on October 15, 2012. Less than a month before, on September 24, 2012, EIntelligence took a time-stamped photograph which showed the ATM with a fee notice sticker clearly visible. Part of EIntelligence's EFTA policy was to take photographs of the ATM for various reasons, including if a sticker was removed by a third-party or when a new sticker was attached to the ATM. The record contains three photographs taken at different times in 2012, all of which include a fee sticker notice clearly affixed in a prominent location on the front of the ATM. Singer's unsupported assertion that the photographs are inadmissible as evidence without any further explanation does not constitute an appropriate denial of EIntelligence's statement of undisputed facts. These photographs themselves are an indication that EIntelligence had been following its two-page EFTA policy—a procedure which this Court finds to be reasonably adapted by EIntelligence to avoid a missing notice. *See Drager v. Bridgeview Bank*, 1:10-CV-7585, 2012 WL 4092740 (N.D. Ill. Sept. 17, 2012) (where the defendant's one-page policy written policy on compliance with the EFTA, along with frequent checks on the ATM constituted a reasonably adapted procedure under the bona fide error defense).

Nothing in the record indicates that EIntelligence intentionally removed the sticker from the ATM or acted in bad faith. EIntelligence has demonstrated that it had in place procedures intended to monitor and maintain the fee stickers on the ATM, and acted on these procedures during 2012 as evidenced by the photographs provided. Regarding Singer's argument that none of EIntelligence's employees ever personally visited the ATM at Kedzie Gas, EIntelligence is not personally obligated to only have employees assess the ATM. It is allowed to hire independent contractors to effectuate its procedures. Additionally, whether actual EIntelligence employees or hired independent contractors performed these procedures is immaterial since all that is required under the bona fide error provision is for EIntelligence to maintain these procedures, which it sufficiently did.

The Court concludes that despite Singer's allegations that there was no fee notice sticker on the ATM at Kedzie Gas, the facts establish this to be an unintentional act. EIntelligence has adapted reasonable procedures to ensure that the fee sticker was on the ATM. This Court finds that EIntelligence has satisfied its burden establishing that the bona fide error defense applies.

Although the Court found that MetaBank was not an operator, it must be noted that the bona fide error defense would have also protected MetaBank from liability. MetaBank asserted the bona fide error defense its answer to the second amended complaint, but did not elaborate on it in its motion for summary judgment. However,

MetaBank still retains this affirmative defense because the policies and procedures implemented by EIntelligence also benefit MetaBank based on the contractual relationship between them. The record indicates that the contract between Defendants specifically states that compliance with applicable laws, including the EFTA, remained as EIntelligence's responsibility. Together with the fact that the record is devoid of any evidence that the non-compliance with the fee sticker requirement was intentional, the EFTA policy implemented by EIntelligence would also assist MetaBank in successfully proving its defense if it became necessary.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motions for judgment on the pleadings and grants summary judgment in favor of Defendants. The pending motion to certify the class is denied as moot.

_____
Charles P. Kocoras
United States District Judge

Dated: July 7, 2014